746 F.2d 1288
 Walter ROGERS, Petitioner-Appellant,
v.
Thomas ISRAEL, Respondent-Appellee.
 No. 83-1001.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 7, 1984.
Decided Oct. 16, 1984.
 
 William J. Tyroler, Wis. Public Defender, Milwaukee, Wis., for petitioner-appellant.
 Thomas J. Balistreri, Asst. Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for respondent-appellee.
 Before CUDAHY and FLAUM, Circuit Judges, and KELLAM, Senior District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 This is an appeal from the district court's denial of a petition for a writ of habeas corpus. For the reasons set forth below, we remand the case to the district court.
 
 
 2
 In the late afternoon of May 29, 1976, the petitioner and Angelo Griffin were at a tavern in Racine, Wisconsin, where they became involved in a dice game with other patrons. When the petitioner refused to pay off on a bet, Griffin pulled the money from the petitioner's hand. Several minutes later, when the petitioner was standing at approximately the third stool along the bar and Griffin was in front of a cigarette machine at the east end of the bar, the defendant took a gun from his pocket and fired. Griffin threw up his arms and ran toward the defendant, who moved away from the bar. A brief struggle occurred, another shot was fired, and both men fell to the floor. The defendant got up, walked outside, hid the gun, and then returned to the tavern, where he was arrested by police. Griffin, who never moved after falling to the floor, was pronounced dead on arrival at a nearby hospital. An autopsy revealed that Griffin suffered a fatal wound to the chest, which was caused by a bullet that entered the left chest, penetrated the heart and right lung, and lodged beneath the skin of the back. Shortly after the incident, the owner of the tavern discovered a bullet hole in the ceiling of the tavern above the cigarette machine.
 
 
 3
 An information charging the defendant with first degree murder was filed on July 7, 1976. The defendant's trial commenced on September 15, 1976, and lasted three days. The state's theory, as explained during the prosecutors' opening statement and closing argument, was that the petitioner's first shot struck Griffin and the second bullet was fired into the ceiling during the ensuing struggle. The prosecutors argued that the petitioner fired the first bullet with the intent to kill, this bullet caused Griffin's death, and the petitioner therefore committed first degree murder. The defense theory, on the other hand, was that the first bullet did not strike Griffin, but instead lodged harmlessly in the ceiling. According to the defense, Griffin was killed by the second bullet, which the defendant fired during the struggle, when he did not have the criminal intent that is required for a first degree murder conviction.[1]
 
 
 4
 A factual dispute relevant to these two theories was whether Griffin would have been capable of engaging in a struggle after receiving his bullet wound. If the wound would have rendered Griffin incapable of such activity, the shot that preceded the struggle could not have caused the wound. The prosecution called as a witness Dr. Myron Schuster, the pathologist who performed the autopsy. Consistent with the state's "first shot" theory, Dr. Schuster stated that it was possible for Griffin to move under his own power after receiving his wound. Trial Tr. at 230. On cross-examination, Dr. Schuster further testified that it was possible for a person with a bullet wound through the heart and right lung to be capable of strenuous activities for half an hour. Trial Tr. at 232. The defense presented no evidence to refute Dr. Schuster's testimony. During closing argument, the defense attorney asked the jurors to use their common sense in concluding that Griffin could not have engaged in a struggle after being shot through the heart.
 
 
 5
 The jury found the petitioner guilty of first degree murder. In a post-conviction motion, the petitioner alleged that he was denied the effective assistance of counsel because his trial counsel failed to reasonably investigate the effect of a heart wound on a person's ability to maintain physical activity. At a hearing on the motion, which took place on November 11, 1977, the petitioner presented Dr. Billy Bauman, a forensic pathologist, who testified that, in his experience, victims of heart wounds comparable to that of Griffin had been immediately incapacitated upon receiving the wounds. Dr. Bauman expressed his opinion that it would be virtually impossible for victims of such wounds to engage in the physical struggle that was described in the testimony at trial. Furthermore, Dr. Bauman stated that he discussed the nature of Griffin's wound with six other pathologists, who agreed that the victim of such a wound would "go down ... right away." Tr. of Proceedings of November 11, 1977, at 17-18. The petitioner's trial counsel also testified at the post-conviction hearing. He said that, after reading Dr. Schuster's autopsy report prior to trial, he attempted to find a medical opinion to the effect that a bullet wound such as that of Griffin would have caused the immediate collapse of the victim. The trial counsel asserted that this attempt consisted of "discuss[ing] certain of [Dr. Schuster's] findings with other physicians," none of whom were pathologists. Id. at 41. Moreover, the trial counsel testified that, if he had read Dr. Bauman's report prior to trial, he would have used it to counter Dr. Schuster's opinion that Griffin was capable of strenuous activity after sustaining his wound.
 
 
 6
 The trial court denied the petitioner's post-conviction motion, stating that it did not "think that Doctor Schuster's testimony was at such great odds with that of Doctor Bauman's to make a substantial difference in the circumstances" of the case. Id. at 70. The petitioner then appealed his conviction to the Wisconsin Court of Appeals, which rejected his ineffective assistance claim, holding that the trial counsel's consultation with various physicians was a good faith investigation and did not constitute ineffective assistance of counsel. The petitioner's subsequent petition for review to the Wisconsin Supreme Court was denied.
 
 
 7
 On June 9, 1981, the petitioner filed a petition for a writ of habeas corpus with the United States District Court for the Eastern District of Wisconsin. While the petition was pending, the petitioner made a motion to expand the record with an affidavit, in which the petitioner's trial counsel stated that his pretrial search for a medical opinion consisted of speaking to one radiologist, who had no expertise or training in either cardiology or traumatic injuries to the heart. The petitioner also moved for an evidentiary hearing on the ground that material facts were not adequately developed at the state court hearing. The district court denied the petitioner's motion for an evidentiary hearing, finding that, after the post-conviction hearing that took place in state court, "another hearing on the same issue in [the federal district] court would be of no benefit ...." Rogers v. Israel, No. 81-C-653, unpublished decision and order at 4 (E.D.Wis. Nov. 22, 1982). With regard to the ineffective assistance claim, the district court considered the performance of the petitioner's trial counsel during the trial, as well as the trial counsel's testimony during the post-conviction hearing,[2] and it concluded that the representation received by the petitioner met minimum standards of professional competence. After reviewing both Dr. Bauman's oral testimony at the post-conviction hearing and his written report, which had been entered into evidence at the hearing, the district court concluded that, in light of the evidence supporting the state's "first shot" theory, "Dr. Bauman's testimony was not as persuasive as [the petitioner] asserts." Id. at 6. The court thus denied the petition for a writ of habeas corpus.
 
 
 8
 In appealing this ruling, the petitioner argues that, contrary to the district court's conclusion, Dr. Bauman's testimony could have made a difference in the jury verdict. However, on the issue of whether the trial counsel's pretrial search for such testimony was reasonably competent, the petitioner asserts that a remand is necessary because the facts surrounding this search were not developed adequately at the post-conviction hearing. The petitioner further argues that, if this court finds a remand unnecessary, the conviction should nonetheless be reversed because it was unreasonable for the trial counsel to fail to consult an expert when investigating the effects of the victim's heart wound. The state responds, first, that the absence of Dr. Bauman's testimony at trial did not affect the verdict because this testimony was not very different from Dr. Schuster's testimony and also because other overwhelming evidence supports the defendant's conviction beyond a reasonable doubt. Second, on the issue of the adequacy of the trial counsel's search for expert testimony, the state asserts that a remand to develop the facts is improper and that the factual record developed at the post-conviction hearing fails to prove that the trial counsel's search was unreasonable.
 
 
 9
 I. STANDARD FOR ASSESSING EFFECTIVE ASSISTANCE OF COUNSEL
 
 
 10
 When determining whether a defendant received ineffective assistance of counsel in violation of the sixth amendment, "[t]he benchmark ... must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, --- U.S. ----, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Accordingly, the Supreme Court has ruled that the defendant must show both that the defense counsel's performance was deficient and that the deficient performance prejudiced the defense. Id. We shall consider these two prongs in reverse order.[3]
 
 A. Prejudice to Defense
 
 11
 To establish that a defense counsel's performance prejudiced the defense, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. 104 S.Ct. at 2068. Thus, where a defendant challenges his conviction, "the question is whether there is a reasonable probability that, absent the error, the factfinder would have had a reasonable doubt respecting guilt." Id. 104 S.Ct. at 2069. As defined by the Supreme Court, "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. 104 S.Ct. at 2068.
 
 
 12
 In deciding whether a defense counsel's failure to investigate expert opinions was prejudicial, courts have considered whether such opinions were critical to the presentation of a defense. See United States v. Fessel, 531 F.2d 1275 (5th Cir.1976) (where evidence that defendant committed offense was virtually uncontested and only issue was sanity of defendant at time of offense, failure of counsel to move for court-appointed psychiatrist under 18 U.S.C. Sec. 3006A(e) constituted ineffective assistance of counsel). See also United States v. Baynes, 687 F.2d 659 (3d Cir.1982) (where only evidence against defendant was intercepted tape recording, failure of defense counsel to investigate possibility of distinguishing exemplar of defendant's voice from voice on intercepted tape was prejudicial to defense). In addition, when determining prejudice, courts have taken into account both the defense counsel's success in eliciting favorable expert testimony through the cross-examination of government witnesses, see Hall v. Sumner, 682 F.2d 786, 789 (9th Cir.1982), and the overall strength of the prosecution's case, see Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir.1984).
 
 
 13
 Under the facts of the present case, there was no question that the petitioner fired a bullet that killed Griffin. The only issue was whether it was the first or second bullet. A review of the record indicates that the eyewitness testimony and the physical evidence presented at trial supported both the "first shot" theory of the state and the "second shot" theory of the defense.
 
 
 14
 Most of the eyewitnesses testified that the petitioner fired the first shot at Griffin while holding the gun with his arm extended parallel to the floor, a description that supports the state's theory that the first shot struck Griffin. However, one eyewitness stated that the petitioner held the gun at an upward angle of 45?, a description that agrees with the testimony of a private investigator, who examined the bullet hole in the ceiling and concluded that the missed shot originated from a spot between the third and fourth stools along the bar and entered the ceiling at a 45? angle.[4] The investigator's conclusion clearly supports the defense theory that the petitioner fired the first bullet into the ceiling while standing at approximately the third stool along the bar.
 
 
 15
 At trial, the state presented a ballistics expert, who testified that powder burns on the clothes surrounding Griffin's wound revealed that Griffin was shot from a distance of four feet, and that burns on Griffin's right forehead indicated that a shot missed him from a closer distance. This testimony coincided with the state's theory that Griffin was struck by the first shot, when the petitioner and Griffin were between two and eight feet apart, and that the petitioner fired into the ceiling during the struggle, when the two men were closer together. However, as pointed out by the defense counsel during closing argument, the petitioner was facing Griffin in such a way that an errant first shot would have passed Griffin's right forehead. Moreover, there was testimony that, during the struggle, the petitioner was backing away from Griffin, and the two men were within arm's contact of each other, but not "hugging." Trial Tr. at 137. Thus, the powder burns on Griffin's clothes are consistent with the defense theory that the second shot struck Griffin from a distance of several feet while Griffin was coming toward the petitioner and while the two were struggling within arm's reach.
 
 
 16
 The eyewitnesses testified at trial that Griffin threw up his arms after the first shot, and one witness demonstrated that Griffin grabbed his chest, thus supporting the "first shot" theory. Yet, all the witnesses also testified that after the first shot, Griffin moved under his own power toward the petitioner and a struggle ensued for a period between thirty seconds and two minutes, during which time Griffin and the petitioner moved north of the bar. This description supports the defense theory that the ceiling shot, which originated from the direction of the bar, had been the first shot. Furthermore, all witnesses agreed that Griffin fell to the floor immediately after the second shot was fired, and Griffin's blood was found only on the spot where he fell, lending further support to the defense's "second shot" theory.
 
 
 17
 As the foregoing evidence demonstrates, it is a close question as to which bullet struck Griffin. The state contended at oral argument that the case is not difficult at all when we take into account the petitioner's testimony that he intended to hit Griffin with his first shot. We disagree. The parties stipulated at trial that, shortly after the shooting, the petitioner's blood alcohol level was measured at .27, Trial Tr. at 225, which was interpreted by Dr. Schuster as intoxication, Trial Tr. at 236-37. In addition, the eyewitnesses testified that the petitioner pulled the gun from his pocket very quickly, and the petitioner asserted that he did not take time to aim. Considering this evidence and the physical evidence discussed earlier, the fact that the petitioner intended to hit Griffin with the first shot is not dispositive proof that he succeeded.
 
 
 18
 In light of the record before us, we disagree with the district court's assessment that the state's case was strong, and we conclude that expert testimony regarding Griffin's ability to engage in physical activity after sustaining a severe heart wound was critical to the presentation of the defense. We also find that the Wisconsin trial court's conclusion that the testimony of Dr. Schuster did not differ significantly from that of Dr. Bauman is not fairly supported by the record. Dr. Schuster testified on direct examination that it was possible for Griffin to move under his own power after sustaining his wound. Rather than weakening this opinion during cross-examination, Dr. Schuster responded to the defense counsel's cross-examination questions by stating that half an hour of physical activity was possible after the receipt of such a wound. Dr. Bauman, on the other hand, testified at the post-conviction hearing that Griffin's wound would "cause immediate incapacitation," and that it was "virtually impossible" for Griffin to have maintained physical activity after being shot. Tr. of Proceedings of November 11, 1977, at 15-16. Although Dr. Bauman understandably hesitated to phrase his opinion in unconditional terms, the fact remains that Dr. Bauman unequivocally testified that, in his experience, he had never seen a case where the victim of a serious heart wound did not collapse immediately.
 
 
 19
 We thus hold that under the very close facts of this case, there is a reasonable probability that if expert testimony such as that of Dr. Bauman had been presented at trial, the jury would have had a reasonable doubt respecting guilt on the charge of first degree murder.
 
 
 20
 B. Adequacy of Defense Counsel's Performance
 
 
 21
 Under the second prong of the Strickland test, a defendant must show that the defense counsel's representation fell below an objective standard of reasonableness. Strickland v. Washington, 104 S.Ct. at 2065. Although this standard is reflected in guides such as the American Bar Association Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980), the proper measure of attorney performance in each case is "simply reasonableness under prevailing professional norms," considering all the circumstances from the defense counsel's perspective at the time. Id. When measuring a defense counsel's performance against this standard, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" that might be considered sound trial strategy. Id. 104 S.Ct. at 2065-66. See also United States v. Payne, 741 F.2d 887, 891 (7th Cir.1984); United States v. Weston, 708 F.2d 302, 306 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 397, 78 L.Ed.2d 340 (1983).
 
 
 22
 Thus, while it is undisputed that a defense counsel should make reasonable inquiry into all defenses, see Arrowood v. Clusen, 732 F.2d 1364, 1370 (7th Cir.1984), "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." Strickland v. Washington, 104 S.Ct. at 2066. In several cases, the failure to investigate and present expert testimony has been found to be a matter of trial tactics within the range of reasonableperformance. See United States v. Krohn, 560 F.2d 293, 297 (7th Cir.) (failure of defense counsel to call fingerprint expert), cert. denied, 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182 (1977); Hall v. Sumner, 512 F.Supp. 1014 (N.D.Cal.1981) (failure of defense counsel to present expert testimony on effects of particular level of blood alcohol), aff'd, 682 F.2d 786 (9th Cir.1982). Yet, under certain circumstances, "it may be vital in affording effective representation to a defendant in a criminal case for counsel to elicit expert testimony rebutting the state's expert testimony." Knott v. Mabry, 671 F.2d 1208, 1212-13 (8th Cir.), cert. denied, 459 U.S. 851, 103 S.Ct. 115, 74 L.Ed.2d 101 (1982). Cf. Williams v. Martin, 618 F.2d 1021, 1027 (4th Cir.1980) (where substantial question requiring expert testimony arose over the cause of victim's death, trial judge's refusal to provide expert deprived defendant of effective assistance of counsel).
 
 
 23
 The amount of investigation into expert opinions that may be required of a defense attorney is discussed in Davis v. Alabama, 596 F.2d 1214, 1221 (5th Cir.1979), vacated as moot, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). In Davis, the defense counsel made no effort to investigate or develop possible sources of evidence regarding the defendant's sanity, even though the counsel knew that the defendant had a history of mental problems and that insanity was the only possible defense. The Fifth Circuit noted that, under Alabama law, even a general practitioner could have testified regarding a defendant's sanity, and it observed that the defense counsel made no effort to have the defendant examined by a physician or to establish facts on which a physician could have based an opinion on the defendant's sanity. The court ruled that, by failing to investigate, the defense counsel did not discharge the duty that they owed to their client, and the court remanded the case for an evidentiary hearing to determine whether the defense counsel would have uncovered helpful evidence if they had acted properly.
 
 
 24
 In the present case, at least seven pathologists in the Racine area held the opinion that a bullet wound such as that suffered by Griffin would cause the immediate collapse of the victim. Although we decline to rule that the defense counsel was required to contact a pathologist, we hold, as the court in Davis similarly held, that the defense counsel owed a duty to the petitioner to ask a qualified expert whether Griffin would have been immediately incapacitated by his wound. We find that, under the particular factual circumstances of this case as known to the defense counsel at the time of trial, the failure to make such an inquiry would have been unreasonable[5] and could not have been based on sound trial strategy.[6]
 
 II. NEED FOR EVIDENTIARY HEARING
 
 25
 It is settled, under Wisconsin law regarding expert witnesses, that "if a person has qualifications in a field, he may testify within the area of his competency.... It is the particular qualifications of the witness in relation to the particular issue which should control rather than the label of a profession or trade." Roberts v. State, 41 Wis.2d 537, 551, 164 N.W.2d 525, 531-32 (1969). See also Karl v. Employers Insurance of Wausau, 78 Wis.2d 284, 297, 254 N.W.2d 255, 261 (1977). In the present case, it has never been determined whether the "physicians" consulted by the defense counsel could have been qualified as medical experts on the subject of the physical capacity of a victim who suffers a bullet wound to the heart, and facts necessary to this determination were not explored at the post-conviction hearing.
 
 
 26
 Where material facts were not adequately developed at the state court hearing, the petitioner is entitled, under both 28 U.S.C. Sec. 2254(d) (1982) and Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), to an evidentiary hearing in federal district court, provided that the failure to develop the state court record was not due to inexcusable neglect or deliberate bypass.[7] See Thomas v. Zant, 697 F.2d 977, 983-86 (11th Cir.1983). See generally United States ex rel. Jones v. Franzen, 676 F.2d 261, 268-70 (7th Cir.1982) (Posner, J., concurring). Thus, in order to obtain this federal hearing, a defendant must show the district court that the undeveloped facts were material and that there was no inexcusable neglect or deliberate bypass in failing to develop these facts. Thomas v. Zant, 697 F.2d at 988. In the present case, it is evident that material facts regarding the experience of the consulted physicians were not developed at the state court hearing, and absent inexcusable neglect or deliberate bypass, the district court erred in denying the petitioner's motion for an evidentiary hearing.
 
 
 27
 Accordingly, we remand this case to the district court, where the petitioner must show that the failure to develop facts regarding the consulted physicians was not due to inexcusable neglect or deliberate bypass. If the petitioner fails in this showing, the writ of habeas corpus will be denied.[8] If the petitioner succeeds in showing the absence of inexcusable neglect or deliberate bypass, the district court must hold an evidentiary hearing, at which both parties may present evidence regarding the defense counsel's efforts to obtain expert testimony. If, after this hearing, the district court finds that none of the physicians consulted by the defense counsel could have been qualified as an expert, the counsel's performance must be judged to have been unreasonable and prejudicial, as discussed in this opinion, and the writ will be granted. If, on the other hand, the district court finds that the trial counsel consulted a physician who could have been qualified as an expert, thereby fulfilling his duty toward his client, the writ will be denied.
 
 
 28
 KELLAM, Senior District Judge, dissenting.
 
 
 29
 As reluctant as I am to do so, I feel I must respectfully disagree with the majority opinion in this case. The only issue before the court is whether Rogers was denied his Sixth Amendment right to effective assistance of counsel grounded in the alleged failure of such counsel to produce expert testimony at Rogers's criminal trial for murder.
 
 I.
 
 30
 The facts are set out in the opinion of the Wisconsin Court of Appeals, supplemented by the record in this case.
 
 
 31
 Tried to the jury, Rogers was found guilty of first degree murder and sentenced to life imprisonment. He unsuccessfully appealed to the Court of Appeals from the judgment of conviction and appealed the orders denying post-conviction relief.
 
 
 32
 Rogers and Angelo Griffin were involved in a dice game at Al's Vega Lounge in Racine. An argument ensued. A few minutes later, Rogers was at the middle of the bar with Griffin standing in front of a cigarette machine at the end of the bar. Rogers pulled a gun from his pocket, pointed it at Griffin and fired. Griffin threw up his arms and ran into Rogers. A struggle occurred and another shot was fired. Both men fell to the floor, but only Rogers got up. Two shots were fired, but only one hit Griffin. The other went into the ceiling, as a bullet hole was found in one of the ceiling tiles. The State contended, and the jury found, the first shot hit and killed Griffin. The defense maintained it was the second shot which hit and killed Griffin. Eyewitnesses testified Rogers fired the first shot while pointing the pistol directly at Griffin with his arm outstretched and parallel to the floor. Dr. Myron Schuster, who performed the autopsy on Griffin, testified Griffin died from a single gunshot wound to the chest with the bullet perforating the heart. Dr. Schuster further testified that while death from this type of wound would be relatively rapid, Griffin, with this type of wound, still could move under his own power for an indeterminate period of time. In a post-conviction hearing, Dr. Billy J. Bauman, a pathologist, testified such a wound would cause a person to drop immediately and be incapacitated, and it would be virtually impossible for such a person to engage in strenuous physical activity. The fact is, all say that when the first shot was fired, Griffin threw his arms up and ran into Rogers and grabbed him. He was only six to ten feet from Rogers, and needed little strength to move and grab Rogers. The second shot followed. Rogers's alleged claim of ineffective assistance of counsel is based on the contention that defense counsel should have found someone like Dr. Bauman to testify at trial. Trial counsel testified at the post-conviction hearing that he discussed certain of Dr. Schuster's findings with physicians in the Racine area in an unsuccessful attempt to get a medical opinion to the contrary. None of those physicians would give an opinion that such a wound would cause the immediate collapse of the victim. None of the physicians were pathologists. The Court of Appeals affirmed the conviction, finding that trial counsel did not breach the duty of effective assistance; that by consulting with various physicians, trial counsel made a good faith investigation and attempted to secure an expert witness to rebut Dr. Schuster's testimony; and the fact he was not successful did not render his assistance ineffective.
 
 
 33
 The district judge reviewed the transcript of the state trial and the hearings on his post-conviction motions. He determined that Rogers had been provided with a full hearing and agreed effective assistance had been provided.
 
 
 34
 Without here repeating what steps and actions the district court determined Rogers's trial counsel did perform to support a defense, suffice it to say the district court found trial counsel's representation was conscientious, vigorous and very competent, and that he skillfully cross-examined the prosecution witnesses, including Dr. Schuster. The district judge further found that while Dr. Bauman testified that the wound which Griffin received would cause the virtual immediate, total incapacitation of the victim, Dr. Bauman's written report set forth:
 
 
 35
 The victim would have been almost immediately incapacitated after receiving his wound, and it would have been almost impossible for him to have engaged in an approximate two-minute vigorous physical struggle.
 
 
 36
 I realize, of course, that one must be extremely cautious in making an absolute statement regarding functional activity after sustaining cardiac wounds since there are apparently substantiated reports in medical literature that victims of such injuries have performed activities that appear incompatible with the injuries sustained.
 
 
 37
 The district court's opinion further sets forth that several eyewitnesses testified Rogers pointed the pistol straight at Griffin when he fired the first shot, and he admitted on cross-examination that he intended to hit Griffin with the first shot.
 
 
 38
 The ballistics expert testified that the fatal shot was fired about four feet from the victim, a distance inconsistent with discharge of the pistol while they were engaged in a struggle. Too, Griffin had gunpowder deposits on his right forehead, strongly suggesting that the bullet which missed him was discharged close to his body and in an upward position.
 
 II.
 
 39
 In testing the performance of counsel in representation of his client in a criminal case, the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland v. Washington, --- U.S. ----, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." Strickland v. Washington, supra, 104 S.Ct. at 2065. The "performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. A fair assessment of attorney performance requires that every effort be made to eliminate the distorted effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. If "counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance." United States v. Cronic, --- U.S. ----, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984).
 
 
 40
 A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and the "burden of demonstrating the contrary is on his former clients." United States v. Cronic, supra, 104 S.Ct. at 2046 n. 23; Matthews v. United States, 518 F.2d 1245, 1246 (7th Cir.1975). No presumption of inadequate representation arises "merely because defendant's attorney ... makes egregious errors, tactical or strategic, in preparation, in conference, in examining witnesses, or in not investigating or calling potential witnesses." United States v. Garcia, 625 F.2d 162, 170 (7th Cir.1980).
 
 
 41
 The adversarial process protected by the Sixth Amendment requires that an accused have counsel acting in the role of an advocate. "When a true adversarial criminal trial has been conducted--even if defense counsel may have made demonstrable errors--the kind of testing envisioned by the Sixth Amendment has occurred." United States v. Cronic, --- U.S. ----, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984).
 
 III.
 
 42
 The Circuit Court of Racine, Wisconsin, and the Court of Appeals have reviewed the exact same record as is before us. Likewise, the District Court reviewed that same record. On the same record, each of those courts found that Rogers failed to show any constitutional violation. That is, each of those courts found that in the light of all the circumstances of the case, counsel's representation was that of reasonable effective assistance.
 
 
 43
 Congress has prescribed how federal courts are to deal with petitions for habeas by persons in custody pursuant to judgment of a state court. Subsection (d) of 28 U.S.C. Sec. 2254 provides that written findings of the state court to an application for relief made after a hearing to which the state and defendant were parties--which is the case here--"shall be presumed to be correct" unless one of the conditions specifically set forth in Sec. 2254(d) is found to exist by the federal habeas corpus, or unless the habeas could conclude that the relevant state court determination is not fairly supported by the record, and the "burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the state court was erroneous." This section "applies to factual determinations made by state courts, whether the court be a trial court or an appellate court." Sumner v. Mata, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). My brothers reach "a conclusion which is [was] in conflict with the conclusion reached by every other state and federal judge after reviewing the exact same record." Id. at 548-49, 101 S.Ct. at 770. Giving the state court's findings the "high measure of deference," Marshall v. Lonberger, 459 U.S. 422, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983), they are entitled to, and the fact that the findings of the district court may be set aside only if there is plain error, I cannot agree the record establishes "by convincing evidence that the factual determination of the state court was erroneous." 28 U.S.C. Sec. 2254(d); Sumner v. Mata, supra.
 
 
 44
 The factual conclusions which we are bound to respect in assessing the constitutional claim of petitioner are the state court records, the findings of the trial court and of the Court of Appeals, as well as the findings of the United States District Court. The trial court observed the actions and conduct of defense counsel at trial, and at the hearing on the petition for habeas relief in the state court. He found that the representation met the required standard. The Court of Appeals agreed, as did the United States District Court. The deference due the findings of the state court "requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations," but instead, "it must conclude that the state court's findings lack even 'fair support' in the record." Marshall v. Lonberger, supra, 103 S.Ct. at 850. The complaint rests on the assertion that trial counsel should have presented medical testimony to refute the opinion of Dr. Schuster. Dr. Schuster was of the opinion that death from a wound of the type Griffin received would be relatively rapid, but that Griffin still could move under his own power for an indeterminate period of time. Dr. Bauman was really not of a different opinion. Though he said at one point such a wound would cause a person to drop immediately and be incapacitated, his written report was admitted into evidence in which he said the victim would have been almost immediately incapacitated and it would have been almost impossible for him to have engaged in a physical struggle. He realized there were exceptions and reports supporting exceptions, as was the case here, and that one must be extremely cautious in making absolute statements regarding functional activity following such a wound, because he was aware that there were substantial reports in medical literature that victims of such injuries have performed activities that appear incompatible with the injuries sustained. He not only qualifies his statement, but candidly admits that the record contradicted his opinion. Trial counsel testified he had talked to several physicians in an effort to challenge Dr. Schuster, but was unable to find one who disagreed. The inference from that is that other physicians agreed with Dr. Schuster. While none of the physicians he talked with were pathologists, there is nothing in the record that suggests that a pathologist is the only qualified physician to give an opinion on the issue or that he is better qualified than other physicians. What petitioner is asserting as ineffective assistance of counsel is the failure of his trial counsel to have known of and to have contacted Dr. Bauman. Nothing in the record suggests that any practicing physician in Racine had an opinion different from Dr. Schuster at the time in question.
 
 
 45
 I cannot agree that trial counsel was ineffective because he was not able to obtain the opinion of Dr. Bauman or someone with an opinion like him, particularly after he had exercised reasonable judgment and had discussed the issue with several physicians without finding one who differed with Dr. Schuster. The Wisconsin Court of Appeals made a distinct finding that trial counsel discussed Dr. Schuster's findings with physicians in the Racine area in an unsuccessful attempt to get a medical opinion contrary to Dr. Schuster, but none would give an opinion that the type of wound sustained by Griffin would cause the immediate collapse of the victim. This factual finding, supported by the record, is credible and binding on the federal courts. This finding of the Court of Appeals was in confirmation of the finding made by the trial court which heard the post-conviction testimony of Dr. Bauman and of trial counsel. The trial court accepted the testimony of counsel that prior to trial he discussed Dr. Schuster's findings with "several physicians" [Tr. of hearing, pp. 41-42] from Racine and was unable to get a contrary opinion.[1] Further, the Wisconsin Court of Appeals found that the evidence was overwhelming; that the first shot fired killed Griffin; that there was no evidence that the first shot was negligently fired; and that Rogers testified that when he fired the first shot, he pointed the gun at Griffin and intended to shoot him. These findings are binding on us, because they are abundantly supported by the record. Eyewitnesses testified that defendant fired the first shot while pointing the gun at Griffin with his arm outstretched and parallel to the floor. Such findings are entirely consistent with the finding that the first shot fired with the gun pointed at Griffin, from close range, was the shot that hit him.[2] In addition, gunpowder deposits found on Griffin's right forehead are consistent with the contention that the second shot fired while the men were locked in a struggle went into the ceiling. Added to this are the findings made by the district judge. Given the findings of the state court that trial counsel did not breach his duty of effective representation, supplemented by the findings of the district court that Rogers received conscientious, vigorous and effective assistance of counsel, I am not willing to say that the failure to further pursue the effort to find a physician who would disagree with Dr. Schuster constituted ineffective assistance of counsel. How are we to say how many physicians trial counsel should have consulted in order to meet the standard expected of counsel. The record is barren of any evidence or suggestions that Dr. Bauman's opinion was widely recognized in the medical profession, or that there was another physician in Racine who was of a different opinion from Dr. Schuster, or that there were textbooks expressing opinions to the contrary. In fact, Dr. Bauman set out in his letter that there were substantial reports in medical literature that victims of such injuries had performed activities that appear incompatible with the injuries sustained. "The ultimate question is not whether representation ... might have been better, rather it is whether it met minimum professional standards." United States v. Garcia, 625 F.2d at 170. The evidence in this case does not overcome the strong presumption of reasonable professional assistance, for it clearly met minimum professional standards.
 
 
 46
 I, therefore, respectfully dissent.
 
 
 
 *
 The Honorable Richard B. Kellam, Senior District Judge for the Eastern District of Virginia, is sitting by designation
 
 
 [1]
 Thus, during closing argument, the defense attorney argued that the jury could find the petitioner guilty either of no offense, if it found that he fired the second bullet out of self defense, or of a lesser included offense, if it found that he fired the second bullet out of an unreasonable fear of harm
 The state has never contended that the jury could have convicted the petitioner of first degree murder if it found that the second bullet killed Griffin.
 
 
 [2]
 The district court did not consider the information in the trial counsel's affidavit, thus implicitly denying the petitioner's motion to expand the record
 
 
 [3]
 The court in Strickland stated that, although it had discussed the performance component of ineffectiveness prior to the prejudice component, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, --- U.S. ----, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984)
 
 
 [4]
 The private investigator explained that he placed a swizzle stick through the bullet hole in the ceiling tile and observed that the stick pointed at a 45? angle in a southwesternly direction toward a spot between the third and fourth stools along the bar. Trial Tr. at 361-62
 The strength of this evidence is illustrated by the trial court's response to the petitioner's post-trial motion for review of the jury verdict. The court suggested that, in light of the investigator's testimony regarding the bullet hole, the jury could have concluded that the second bullet hit the ceiling during the struggle if it found that "somehow this bullet ricocheted from another object ... [even though] [t]here was no proof of any mark from which it may have ricocheted ...." Trial Tr. at 510.
 
 
 [5]
 The fact that the trial counsel's performance was otherwise admirable would not excuse the failure to conduct a proper investigation. See Moore v. United States, 432 F.2d 730, 739 (3d Cir.1970) (en banc) ("representation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case ...")
 
 
 [6]
 Indeed, at the post-conviction hearing, the trial counsel indicated that, as part of his trial strategy, he had hoped to obtain favorable expert testimony, and he would have presented testimony like that of Dr. Bauman if he had found it
 
 
 [7]
 The Court in Townsend stated that
 [i]f for any reason not attributable to the inexcusable neglect of the petitioner, see Fay v. Noia, 372 U.S., p. 438 [83 S.Ct., p. 848] ..., evidence critical to the adequate consideration of the constitutional claim was not developed at the state hearing, a federal hearing is compelled. The standard of inexcusable default set down in Fay v. Noia adequately protects the legitimate state interest in orderly criminal procedure ....
 Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). In Fay, the Court held that "the federal habeas judge may in his discretion deny relief to an applicant who has deliberately bypassed the orderly procedure of the state courts and in so doing had forfeited his state court remedies." Fay v. Noia, 372 U.S. 391, 438, 83 S.Ct. 822, 848, 9 L.Ed.2d 837 (1963).
 The Eighth Circuit, in Guice v. Fortenberry, 661 F.2d 496 (5th Cir.1981) (en banc), applied the inexcusable neglect/deliberate bypass standard where facts crucial to a habeas petition were not developed at the state court hearing. The court noted that there was "no substantial allegation that the petitioners made a tactical choice to leave the evidence undeveloped." Id. at 507. Observing that it appeared that at the state court hearing, "the defendants and their attorneys did not appreciate fully the relevance of the missing evidence," the court held that such neglect is not inexcusable within the meaning of Townsend and Fay. Id. See Wright & Sofaer, Federal Habeas Corpus for State Prisoners: The Allocation of Fact-Finding Responsibility, 75 Yale L.J. 895, 971 & n. 273 (1966) ("where counsel ... failed because of insufficient preparation or other neglect to marshall all crucial evidence underlying a federal claim, a knowing default should not be found .... [Townsend ] reflects [the] position that unintentional flaws of counsel should not bar the assertion or full development of federal rights"). See also Thomas v. Zant, 697 F.2d 977, 981 n. 6 (11th Cir.1983).
 
 
 [8]
 Without showing the absence of inexcusable neglect or deliberate bypass, the petitioner is considered to have waived further development of facts. See generally Fay v. Noia, 372 U.S. at 438, 83 S.Ct. at 848; Thomas v. Zant, 697 F.2d at 981. In the present case, the facts that were established at the state court hearing do not demonstrate that the "physicians" consulted by the trial counsel could not have been qualified as experts. Thus, if we were to consider only these facts, we could not conclude that the petitioner met his burden of demonstrating ineffective assistance of counsel. See, e.g., Marino v. United States, 600 F.2d 462, 464 (5th Cir.1979) ("a defendant represented by retained counsel who urges ineffectiveness of counsel bears the burden of establishing that charge, by a preponderance of the evidence")
 
 
 [1]
 Defendant's brief sets forth that Rogers's state appellate counsel, in his appellate brief, set forth that trial counsel had spoken to five physicians
 
 
 [2]
 The ballistics expert said the shot in the heart was fired from about four feet. This coincides with the distance separating the two, rather than with them locked in a struggle