UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth Raymond KROHN and Margaret
Ann Krohn, Defendants-Appellants.

Nos. 76–1902, 76–1903.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1977.

Decided Aug. 12, 1977.

Certiorari Denied Oct. 11, 1977.
See 98 S.Ct. 275.

Lance Haddix, Chicago, Ill., for defendants-appellants.

Donald B. Mackay, U. S. Atty., Gerald Fines, Asst. U. S. Atty., Springfield, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and BAUER, Circuit Judges.

PELL, Circuit Judge.

On April 9, 1976, a nine-count indictment was returned in the Southern District of Illinois, charging Kenneth and Margaret Krohn (Mrs. Krohn being named in only five counts) with unlawful interstate transportation of nine falsely made and forged bank checks on various dates between May 26, 1975, and January 10, 1976. Jury trial was had on July 15 and 16, 1976, and defendants were convicted. Four arguments are made on appeal. The facts pertinent to each are set out in the course of the discussion which follows.

## I

Appellants argue that a violation of the Speedy Trial Act of 1974, 18 U.S.C. § 3161 et seq., (Supp. V, 1975), entitles them to have their convictions reversed and the indictments dismissed, or at least that they are entitled to a new trial. The Act establishes a comprehensive set of time limits designed to assure speedy trials, 18 U.S.C. § 3161, including certain specified types of delays not to be counted under the time limits, id., § 3161(h), establishes sanctions for violations of the time limits, id., § 3162, and sets out effective dates for these provisions, id., § 3163. It is undisputed that the limits and sanctions of §§ 3161–3162 had not become effective in this case and that the controlling provision is § 3164, which provides "interim" limits,[1] one of which is that the trial of "detained persons who are being held in detention solely because they are awaiting trial" "shall commence no later than ninety days following the beginning of such continuous detention." This provision, we agree, did apply to these appellants.

The facts of the case lead the parties to disagree as to whether the ninety-day period had run prior to the commencement of

1. Section 3164 provides:

(a) During an interim period commencing ninety days following July 1, 1975 and ending on the date immediately preceding the date on which the time limits provided for under section 3161(b) and section 3161(c) of this chapter becomes effective, each district shall place into operation an interim plan to assure priority in the trial or other disposition of cases involving—

(1) detained persons who are being held in detention solely because they are awaiting trial, and

(2) released persons who are awaiting trial and have been designated by the attorney for the Government as being of high risk.

(b) During the period such plan is in effect, the trial of any person who falls within subsection (a)(1) or (a)(2) of this section shall commence no later than ninety days following the beginning of such continuous detention or designation of high risk by the attorney for the Government. The trial of any person so detained or designated as being of high risk on or before the first day of the interim period shall commence no later than ninety days following the first day of the interim period.

(c) Failure to commence trial of a detainee as specified in subsection (b), through no fault of the accused or his counsel, or failure to commence trial of a designated releasee as specified in subsection (b), through no fault of the attorney for the Government, shall result in the automatic review by the court of the conditions of release. No detainee, as defined in subsection (a), shall be held in custody pending trial after the expiration of such ninety-day period required for the commencement of his trial. A designated releasee, as defined in subsection (a), who is found by the court to have intentionally delayed the trial of his case shall be subject to an order of the court modifying his nonfinancial conditions of release under this title to insure that he shall appear at trial as required.

appellants' trial. Appellants were first arrested in the Eastern District of Illinois on or before March 29, 1976, by state authorities, but it was not until that date that they were transferred to federal custody. Two earlier federal indictments and arrest warrants had named appellants. One, from the Eastern District of Wisconsin, charged unlawful flight to avoid state forgery prosecutions. The other, from the Southern District of Iowa, charged the same crime that appellants stand convicted of, specifying, in fact, the transportation of one forged check (from Iowa to Wisconsin) that appears to have been the same check appellants were charged with transporting (from Illinois to Wisconsin) in Count IX of the instant indictment. Motions to remove appellants to Iowa or Wisconsin were pending before a magistrate from the date of appellants' custody until April 19, 1976, when the motions were withdrawn. Meanwhile, the instant indictment, as we have noted, was filed in the Southern District on April 9, 1976, and arrest warrants were issued that same day. The warrants were not served, however, until April 20, 1976.

■ Emphasizing that one grand scheme (if any existed) underlay each of the federal indictments, appellants insist that the ninety-day clock began to tick when they were taken into federal custody, or at the latest when the Southern District indictment and warrants were issued. Calculated thus, the ninety days expired before trial. The Government, on the other hand, points to the date the Southern District warrants were served by which starting point the trial began and ended within the ninety-day period. A moderately fertile imagination would have no difficulty conjuring up many of the arguments the parties have made as to the proper starting point. We have no need to repeat or resolve them here, for we may assume for the purpose of argument without deciding that the ninety-day period ran out before appellants were tried[2] and still conclude as we do that they are not entitled to relief.

■ The statute is quite clear as to the remedy for its violation: failure to begin the trial within ninety days "shall result in the automatic review by the court of the conditions of release. No detainee, as defined in subsection (a) [such as the Krohns], shall be held in custody *pending trial* after the expiration of such ninety-day period. . . ." (Emphasis supplied.) § 3164(c). The emphasized language strongly indicates that the Government's right to proceed with the trial was not to be affected. After examining the legislative history, the Ninth Circuit stated that "release of the defendant from custody, and nothing less, is the sanction for delay beyond the ninety-day period." *United States v. Tirasso, supra,* 532 F.2d at 1300.[3] We agree, but we think it equally obvious that *nothing more* is required. If there were any doubt on the subject, a quick reference to § 3162, where sanctions (not applicable to the interim limits) include dismissal of the indictment, establishes beyond peradventure that Congress knew how to specify such a sanction when it was intended.

■ Appellants never asked the district court to set them free pending trial. They asserted the pretrial delay only by way of their motion, filed the day before trial, to dismiss the indictment. The district court properly denied the motion, for such relief

---

**2.** Such a conclusion would necessarily involve holding that the exclusions from cognizable delays set out in § 3161(h) do not apply to the interim time limits under § 3164, for "delay resulting from proceedings relating to transfer from other districts" is specifically excluded, § 3161(h)(1)(F), and to exclude the appropriate period here would put the trial back within the ninety-day period, whichever starting point was used. The Ninth Circuit has held that the exclusions do not apply to the interim limits, *United States v. Tirasso,* 532 F.2d 1298, 1300

n.1 (9th Cir. 1976); *but see United States v. Corley,* 179 U.S.App.D.C. 88, 548 F.2d 1043 (1976); *United States v. Mejias,* 417 F.Supp. 579 (S.D.N.Y.), *aff'd on other grounds sub nom. United States v. Martinez,* 538 F.2d 921 (2d Cir. 1976); and *United States v. Masko,* 415 F.Supp. 1317 (W.D.Wis.1976).

**3.** Appellants' substantial reliance on *Tirasso* is somewhat puzzling, for pretrial release during ongoing delay was the only relief sought or given in that case.

is not available for violations of the interim time limits. It is, of course, regrettable that the district court did not, sua sponte, provide the automatic review of the conditions of release which § 3164(c) requires, but that failure surely does not vitiate the fairness of appellants' trial or justify dismissing the indictment.

We note, finally, that appellants' reliance on *Strunk v. United States,* 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973), is entirely misplaced. The Supreme Court did hold in that case that the only possible relief for denial of the *constitutional* right to a speedy trial was dismissal of the indictment, but it is difficult to see how that aids appellants, who make no claim of any denial of constitutional right.

## II

The district court admitted testimonial evidence that a "Marvin Halvorson" telephoned the Bank of Danville in March 1976 attempting to open a checking account in the name of "Marvin Halvorson Roofing and Siding" because he had moved to Danville and had employees who would need to be paid. The vice president with whom he spoke refused to open an account over the telephone, and "Halvorson" advised that his wife would come in shortly to finalize the arrangements. "Mrs. Halvorson", whom the vice president identified as Mrs. Krohn, later appeared at the bank, ordered printed checks for the fictitious firm, and took the signature cards with her, promising to mail them back to the bank. She stated that she could not bring them back because she and her husband were on their way to a funeral in Chicago. Appellants argue that this evidence, and that of two police officers pertinent to these events, was improperly and prejudicially admitted.

First, they argue, these acts were not criminal. Even assuming that to be the case, however, it does not advance their argument. Fed.R.Evid. 404(b) explicitly provides that "[e]vidence of other crimes, wrongs, *or acts*", while inadmissible to prove a person's character, "may . . . be admissible for other purposes, such as

proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis supplied.) Although many of the cases applying this rule and its common law predecessors have concerned proof of other crimes, this court has already rejected the argument that the criminality of other proven acts is the "sine qua non for admissibility" under such theories. *United States v. Senak,* 527 F.2d 129, 143 (7th Cir. 1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 758 (1976). We adhere to that view.

Appellants' argument then jumps to the asserted proposition that the probative value of the Danville evidence was substantially outweighed by its prejudicial effect. *See* Fed.R.Evid. 403. Significantly, appellants do not argue the middle question, whether the evidence *had* probative value. In fact, it is virtually conceded that the evidence could be admitted to show a common scheme or pattern, as indeed it does. The checks involved in this case were all drawn on a fraudulent Milwaukee bank account, which a male caller had opened by telephone, explaining that he had recently moved to the city and had a business whose employees needed to be paid. Printed checks were ordered and Mrs. Krohn picked them up. Numerous times in the course of their fraudulent scheme the Krohns explained their transient status by saying they were on their way to a funeral somewhere.

Once it is recognized that the Danville evidence did tend to show a common scheme or plan, the insubstantiality of appellants' objection to it is manifest, for broad discretion is properly accorded a district court in its determination whether probative value is outweighed by prejudice. *United States v. Serlin,* 538 F.2d 737, 747 (7th Cir. 1976). The only factor asserted to us to demonstrate an abuse of that discretion here is that the Danville incidents were "remote in time" from the acts charged in the indictment. Recognizing that two and one-half months may, in some cases, make certain "other acts" evidence too remote to

retain substantial probative value, we do not think that that period, intervening between the last act charged in an eight-month scheme based on a Milwaukee account and the attempt to open a new fraudulent account, presents such a case.

## III

Immediately before the jury retired to deliberate, counsel for the Government informed the court, in the presence of defense counsel, that one of the jurors had given the appearance of having been asleep during parts of the trial. Instead of looking into the matter further (perhaps by private questioning in the presence of counsel) and/or dismissing the juror and substituting an available alternative, the district court sent the original twelve jurors off to deliberate. Defense counsel neither moved for a mistrial nor requested substitution of the alternate juror until after guilty verdicts were returned. Only then was a mistrial motion presented, the denial of which is asserted as reversible error here.

The only conclusion possible from this record is that defense counsel, fully aware of the existence of the problem that is now pressed upon us, deliberately chose to proceed with the original jury to create a no-lose situation: either a not guilty verdict would be returned or an arguably tainted guilty verdict would provide a basis for appeal. We strongly disapprove such a "gamesmanship approach to criminal justice." *United States v. Kopel,* 552 F.2d 1265 at 1275–1276 (7th Cir. 1977). "We should not, and will not, permit a litigant to sit quietly by observing the commission of what he claims at the appellate level is reversible error unless we are satisfied that the error was obvious, affected the substantial rights of the accused, and if uncorrected would be an affront to the integrity and reputation of judicial proceedings." *Id.* at 1274.

■ We do not believe this is such a case. No doubt, the proper procedure where a question is raised before a jury retires as to whether a juror had the capacity to attend conscientiously to his duties would be for the district court to satisfy itself that no problem existed or to seat an available alternate. But defense counsel's knowing refusal to bring his concerns (articulated in a mistrial motion *after* verdicts were returned that very day) to the court's attention at a time when they could have been simply alleviated substantially undercuts appellants' argument on appeal. We do not think it would be an "affront to the integrity and reputation of judicial proceedings" to refuse to reward appellants' gamesmanship in the circumstances of this case. This conclusion is buttressed by the district court's crediting the questioned juror's testimony (after verdict, on consideration of the mistrial motion) that he had "dozed off" only once, and briefly at that, and had heard the testimony in the case.

## IV

Appellants' final argument is that their defense counsel at trial failed to meet that "minimum standard of professional representation," *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir. 1975), *cert. denied sub nom. Sielaff v. Williams,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109, required under the Sixth Amendment. There is no merit to this contention.

■ The sole point made by appellants here is that their trial counsel did not call a fingerprint expert to rebut the testimony of the Government's expert. No specific weaknesses in the testimony of the Government witness are asserted, and the argument thus reduces to the speculative possibility that another expert might have had a different view. This represents a question of trial tactics, and this court will not second-guess such tactical decisions in applying the Sixth Amendment. *See United States v. Chaussee,* 536 F.2d 637, 643 (7th Cir. 1976). The record as a whole gives no support to appellants' assertion that trial counsel performed incompetently, as appellants concede, and the district court's statement, at the conclusion of the trial, that defense counsel "performed ably and professionally" is also entitled to some weight.

For the reasons set out herein, the judgments of the district court are affirmed.

Affirmed.