**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jose Mendez GANDARA,**
**Defendant-Appellant.**

**No. 77–2213.**

United States Court of Appeals,
Seventh Circuit.

Heard Sept. 13, 1978.

Decided Nov. 15, 1978.

---

---

Nichols, J., dissented and filed opinion.

Bruce Roth, Chicago, Ill., for defendant-appellant.

Thomas A. Durkin, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, Circuit Judge, NICHOLS, Judge,* and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

The defendant, Jose Gandara, was convicted by a jury of distributing heroin in violation of 21 U.S.C. § 841(a)(1). Gandara raises three issues on appeal: whether certain evidence, allegedly hearsay, was improperly admitted; whether the trial court's sentencing of defendant without benefit of a presentence report was prejudicial error; and whether the conviction should be set aside for impermissible delay. We find all of the defendant's contentions meritless and accordingly affirm the conviction.

I

The government's evidence against defendant Gandara, although circumstantial, was strong and convincing. Government undercover agents testified that they had made arrangements with Gandara's co-defendant, Chavez, for the purchase of a substantial amount of heroin. Accordingly, on July 12, 1977, they went to Chavez's home to consummate the transaction. At that time Chavez told them that he could sell them ten ounces of heroin at $750 per ounce and four kilograms at $28,000 per kilogram. The ten ounce transaction was immediately completed, and Chavez said that he would have to contact his source to obtain the remaining four kilograms. Chavez made a telephone call to try to reach his source and

---

* Honorable Philip Nichols, Jr., Associate Judge, United States Court of Claims, is sitting by designation.

went across the street to a tavern for the same purpose. Claiming to be unable to locate his source, he told the agents to return in an hour. The agents returned two more times that afternoon and were told each time that the heroin had not arrived. Finally, on the third trip to Chavez's, the agents were told that the heroin was delivered. Chavez was given the money, and he returned moments later bearing a styrofoam cooler in both hands. The cooler contained heroin.

Defendant Gandara's participation in this transaction was detailed by two surveillance agents who were posted by Chavez's home. After the undercover agents left for the first time, the defendant was seen talking to Chavez on Chavez's front porch. After the first two return trips of the agents, but before the successful third trip, the defendant was seen driving a car to Chavez's house and parking it in a nearby alley. The surveillance agents testified that Gandara then removed a white stryofoam cooler from his trunk, lifting it with both hands, and gave it to Chavez, who also carried it away with both hands.

The defendant does not deny the surveillance agents' account, but disputes any inference of criminal action. Gandara testified that after having a beer in the tavern across from Chavez's, he began to walk home. On his way he saw Chavez, whom he knew because their children went to the same school. Defendant claimed that he then stopped to complain to Chavez about the behavior of Chavez's children, who were allegedly "messing" the defendant's home when he was at work. Chavez then allegedly took this opportunity to ask the defendant if he could borrow his cooler. How Chavez, with whom defendant claimed only to be casually acquainted, knew that the defendant had such a cooler or how the conversation took such a turn is not revealed by the defendant's testimony. Thereafter defendant went home, dusted the cooler, for no apparent reason put

"some water" in it, and returned it to Chavez. He denied that the cooler contained heroin.

The defendant objects to the trial court's admission of the government agent's testimony relating to a prior transaction on July 5 between the agent and Chavez. The agent testified that the defendant was observed talking with Chavez on July 5. Further, the agent testified that Chavez had told him that he was in contact with a person who could supply the requested amount.[1] The defendant argues that this testimony was hearsay and was admissible only if it fits within an exception to the hearsay rule. The defendant further argues that the only possible exception applicable would be that for statements in furtherance of a conspiracy. Since there was insufficient independent evidence of a joint venture or conspiracy, this evidence would therefore be inadmissible.

■ The defendant's argument here, however, cannot prevail. The defendant has characterized all of the government's testimony as to the July 5th transaction as hearsay. Certainly, the agent's testimony that he saw Gandara with Chavez minutes before the transaction is not hearsay. Hearsay is defined in the Federal Rules of Evidence as a "*statement,* other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(d) (emphasis added). The witness testifying to Gandara's presence at a conversation was not testifying as to any statement made out of court; he was testifying as to a fact within his own personal experience. As such, testimony that Gandara had been seen conversing with Chavez was not hearsay and was properly admissible.

■ Gandara, however, also disputes the admission of the remainder of the agent's testimony, that is, that Chavez told the

---

1. The original offer of proof by the government was that the witnesses to the July 5th transaction would testify that Chavez identified Gandara as his source. The court refused to permit this evidence and limited the testimony solely to Gandara's presence before the transaction and Chavez's reference to his "source."

agent that he "was in contact with a person who had enough of it [heroin]." (Tr. at 314). We do not accept the government's theory that this was admissible as a statement in furtherance of the conspiracy. It is not clear how such a statement furthered the ultimate ends of the conspiracy. Once agreement had been reached between Chavez and the agents as to the sale of heroin, the objectives of the conspiracy were satisfied. Chavez's obvious statement that he had a source was, at that point, pure surplusage.[2] Even if this testimony is hearsay, we are at a complete loss to see how this statement, that Chavez had a source, prejudiced the defendant. As the defendant admits, the most devastating part of this testimony was that identifying Gandara as present with Chavez before the transaction.[3] The statement by Chavez that he had a source added nothing to that impact. Since the source remained unidentified in the statement, whatever conclusion the jury drew as to who that source was, originated from the admissible testimony of Gandara's presence. Thus, although the admission of this statement was error, we do not consider it grounds for reversal.

## II

■ The defendant next argues that the trial court erred by sentencing the defendant without benefit of a presentence investigation report. At the sentencing hearing, the government asked the court to advise the defendant of his statutory right to a presentence report[4] so that he could enter a knowing waiver of that right. The court then directed the following remarks to the defendant:

[T]he attorney for the government . . says that the law requires that there be a presentence investigation by the probation officer. I do not know whether that is true or not, but I do not believe that it is. But in any event, your attorney informs me that you do not desire a presentence investigation and wish to have the Court impose sentence this morning without such an investigation.

Is that correct?

The record then shows that the defendant responded affirmatively. The court thereupon proceeded to impose the maximum sentence on the defendant.

The defendant now argues that he should be granted a new sentencing hearing because of failure of the court to consider a presentence report. The basis of this argument, however, is not clear to us. The defendant apparently seeks to overcome his waiver on the record of this statutory right to a presentence report by placing reliance on *United States v. Pinkney,* 179 U.S.App. D.C. 282, 551 F.2d 1241 (1976). In *Pinkney,* the court remanded for a new sentencing hearing where it was clear that defense

---

**2.** This is the same reasoning which led the trial court to exclude testimony of Chavez's identification of Gandara as his source for the July 5th transaction. *See* note 1 *supra.* As the trial court stated:

identifying Gandara as the source to me does not advance the conspiracy. . . . It does not impress the buyer, it seems to me, any more than for Chavez to say, "I have got a source down in Mexico," or, "I have got a source."

(Tr. at 299). Thus, the trial court itself admitted that here the statement that one has a source does not aid the conspiracy.

**3.** The defendant assesses the damage done by the testimony as follows:

Because the evidence against defendant was totally circumstantial, the most damaging evidence presented by the Government was the testimony of the informant Zuniga concerning the purchase of one ounce of her-

oin from Hilario Mejira Chavez on July 5, 1977. Zuniga and Agent Perez were permitted to testify that defendant was with Chavez outside of Chavez's home for a few minutes prior to the sale by Chavez to Zuniga.

(Brief for Defendant at 22). The defendant at this point does not even mention Chavez's statement that he had a source.

**4.** Rule 32(c)(1) of Fed.R.Crim.P. provides in part:

The probation service of the court shall make a presentence investigation and report to the court before the imposition of sentence or the granting of probation unless, with the permission of the court, the defendant waives a presentence investigation and report, or the court finds that there is in the record information sufficient to enable the meaningful exercise of sentencing discretion, and the court explains this finding on the record.

counsel had been unfamiliar with, and unprepared to rebut, a detrimental letter contained in the presentence report. To reach this result the court articulated several specific obligations of defense counsel at the sentencing hearing. Failure to comply with those obligations would result in the court finding, as an exercise of its supervisory power, that there had been ineffective assistance of counsel. Thus, the defendant is apparently arguing that the defense counsel has an obligation to request a presentence report and that a failure to do so would *per se* constitute ineffective assistance of counsel.[5]

We do not agree. First, it must be noted that the obligation imposed on defense counsel by *Pinkney* was to familiarize himself with existing reports on which sentencing might be based, not to generate additional reports for sentencing purposes.[6] Further, we cannot reconcile use of the supervisory power to require counsel to demand a presentence report with the existence of rule 32(c)(1) of the Federal Rules of Criminal Procedure, which itself contemplates the possibility of waiver. Finally, even if there were a constitutional right to such a report, an issue which we do not

reach, the record shows a full and knowledgeable waiver by the defendant after having been advised of the possible right to such a report.[7]

### III

The final ground for reversal urged by the defendant is that there was undue delay in the commencement of his trial. This argument is based on both the Speedy Trial Act of 1975, 18 U.S.C. §§ 3161–74 (1976), and the Sixth Amendment. We find both bases of this claim to be without merit.

▪ We consider first defendant's claim based on the Speedy Trial Act. Section 3161 of that act specifies certain time periods for indictment, arraignment and trial. 18 U.S.C. § 3161(a)-(c) (1976). The time periods required by the act are phased in gradually. Adherence to the shortest time table is not required by the act until July 1, 1979. *Id.* at § 3161(f)-(g). During this interim period, however, a special provision applies to "detained persons who are being held in detention solely because they are awaiting trial." This provision, set out in the margin,[8] requires that no such detainee

---

**5.** Counsel for the defendant also makes the passing remark, "It must be remembered that defense counsel had serious medical difficulties during the course of the trial . . . which *may* have interfered with his ability to properly prepare for a sentencing hearing." Brief for Defendant at 35 (emphasis added). Since counsel has not claimed that these medical difficulties precluded the more difficult task of providing effective assistance at trial, we cannot believe that this is a serious assertion that they rendered ineffective assistance at sentencing.

**6.** The *Pinkney* court phrased this obligation in these terms:

[C]ounsel should . . . familiarize himself with all reports serving as a foundation for sentence sufficiently in advance of the sentencing hearing, assuming access to such reports at this time. . . . It is axiomatic that this duty extends to familiarization with *all* reports upon which disposition may be based.

179 U.S.App.D.C. at 290–91, 551 F.2d at 1249–50.

**7.** *See, e. g., United States v. Kidding,* 560 F.2d 1303 (7th Cir.), *cert. denied sub nom. United*

*States v. Brown,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977).

**8.** (a) During an interim period commencing ninety days following July 1, 1975 and ending on the date immediately preceding the date on which the time limits provided for under section 3161(b) and section 3161(c) of this chapter become effective, each district shall place into operation an interim plan to assure priority in the trial or other disposition of cases involving—

(1) detained persons who are being held in detention solely because they are awaiting trial, and

(2) released persons who are awaiting trial and have been designated by the attorney for the Government as being of high risk.

(b) During the period such plan is in effect, the trial of any person who falls within subsection (a)(1) or (a)(2) of this section shall commence no later than ninety days following the beginning of such continuous detention or designation of high risk by the attorney for the Government. The trial of any person so detained or designated as being of high risk on or before the first day of the

shall be held in custody pending trial for more than ninety days. After this interim period ends on July 1, 1979, this special provision for pre-trial detainees is no longer in effect, and the final time limits of section 3161 will apply to all those awaiting trial, whether detained or not. Commencing with this period, section 3162 will go into effect and require dismissal of an indictment where the indictment, arraignment or trial has been improperly delayed. *Id.* at § 3161(c).

The defendant's only possible claim here must be based on the special interim provision for pre-trial detainees. The general time limits imposed by section 3161 as in effect during the period encompassing the defendant's arrest and trial were apparently satisfied.[9] However, the ninety day time limit for pre-trial detainees was clearly not followed here. It is undisputed that the defendant was held in custody for 133 days before trial. However, the remedy for such a violation is not dismissal of the indictment but release of the defendant from custody. This was our clear holding in *United States v. Krohn,* 560 F.2d 293 (7th Cir.), *cert. denied,* 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 185 (1977). In *Krohn* we noted that the failure of Congress to explicitly provide for dismissal, as it had done for cases arising after the act becomes fully effective in 1979, indicated that the remedy provided by the interim section itself—release of the defendant—was the only remedy available to the defendant.[10]

The defendant here never requested that the district court release him from custody pending trial. Exactly like the defendants in *Krohn,* the defendant here "asserted the pretrial delay only by way of their motion, filed the day before the trial, to dismiss the indictment." 560 F.2d at 295. Thus, here, as in *Krohn,* we decline to hold that the indictment should have been dismissed.

■ The defendant also urges that the delay in his case violated the Sixth Amendment. The factors involved in determining whether a particular delay violates the Sixth Amendment were set forth by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). There the Court stated:

A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

interim period shall commence no later than ninety days following the first day of the interim period.

(c) Failure to commence trial of a detainee as specified in subsection (b), through no fault of the accused or his counsel, or failure to commence trial of a designated releasee as specified in subsection (b), through no fault of the attorney for the Government, shall result in the automatic review by the court of the conditions of release. No detainee, as defined in subsection (a), shall be held in custody pending trial after the expiration of such ninety-day period required for the commencement of his trial. A designated releasee, as defined in subsection (a), who is found by the court to have intentionally delayed the trial of his case shall be subject to an order of the court modifying his nonfinancial conditions of release under this title to insure that he shall appear at trial as required.

18 U.S.C. § 3164 (1976).

**9.** During the period between July 1, 1976 and July 1, 1977, the dates involved here, the act imposed a 45 day limit on the period between arrest and indictment, a ten day limit on the period between indictment and arraignment, and a 120 day limit on the period between arraignment and trial. 18 U.S.C. §§ 3161(c), (f) & (g) (1976). The defendant here was arrested on August 17, 1976. Thirteen days later the indictment was returned in open court and defendants were arraigned. Seventy-eight days later, on November 17, trial commenced. These are well within the applicable periods, and thus we need not address the difficult issue of what sanctions are available for their violation as opposed to violation of the interim provision governing detainees, pending the effective date of section 3162.

**10.** The same conclusion has been reached by the Eighth Circuit. *United States v. Krohn,* 558 F.2d 390 (8th Cir.), *cert. denied,* 434 U.S. 868, 98 S.Ct. 207, 54 L.Ed.2d 145 (1977).

Two of these factors are dispositive here. First, the delay in this case was relatively brief: 133 days, as opposed to the ten month delay found constitutionally permissible in *Barker*. 407 U.S. at 520, 92 S.Ct. 2182. Second, and more importantly, the defendant here makes no specific assertion of any particular way in which this relatively brief delay impaired his ability to prepare his defense. Thus, we hold that the instant case presents no constitutional problem of delay.

For all the reasons set forth above, we find the defendant's appeal to be without merit.

AFFIRMED.

NICHOLS, Judge, dissenting:

I would reverse. I agree with most of what is said in the court's opinion, but must dissent because I believe defendant Gandara was prejudiced by the erroneous admission of evidence relating to happenings on July 5, 1977. The one count on which Gandara was tried related to a transaction on July 12, 1977, and no other. Gandara was the sole defendant in the trial, although the jury was advised that Chavez was also charged. Chavez was proved to have sold heroin to Government undercover agents, and as the court says, the evidence was convincing that Gandara was the source of supply who brought the heroin to Chavez immediately before the sale. There was no conspiracy count.

The prosecutor offered to prove by a "co-operating individual" that on July 5 Chavez told this informant that Gandara was his source of supply. The trial court refused to admit this but allowed evidence to go to the jury that on July 5 Gandara was seen on the street talking to Chavez, and after he was gone, Chavez sold heroin to the informant; also that Chavez said he had a source. The court told the jury that Gandara was not charged with anything that occurred on July 5, but he was admitting the evidence for whatever weight the jury might "feel it has as a circumstance bearing upon what happened on July 12th."

The Government says, and I agree, that the statement of July 5 that Gandara was the source of supply might well have been admitted. Then it might have proven a joint venture in the heroin business, to which Gandara and Chavez were parties. The court seemed to believe divulging the identity of the supplier did not further the "conspiracy," as did the fact Chavez had one, but it is to be presumed that, in a business transaction, parties will know what to divulge to bring about a meeting of minds. Naming the supplier added a nugget of information for "artistic verisimilitude." If allowed to hear this, the jury could have seen at once what bearing the testimony, if believed, had on the events of July 12.

With it left out, the purpose of showing what was shown about July 5, became a mystery. It reads like some gossip column item where a forthright charge might incur a libel suit, so statements are put in juxtaposition to suggest the charge to the reader by innuendo. That Gandara was present on the street, talking to Chavez, before the July 5 sale had no tendency to make it more likely than not, that he had anything to do with that sale. That Chavez had a supplier had no such tendency either. Yet put the items in juxtaposition, and the jury is set to wondering why. If Gandara were the supplier of July 5, but some mysterious operation of the rules of evidence kept this from being divulged, that would explain everything. Thus by innuendo was suggested to the jury what they were not told directly, that Gandara was the supplier on July 5.

The plain, simple, old-fashioned rule is that evidence of crimes other than the one described in the indictment is inadmissible. There are exceptions, but none applicable here. The Government argued two theories, both of which the court rejects. One is the conspiracy theory. The other it rejects *sub silentio, i. e.,* that the street conversation of July 5 tended to refute the claim Gandara was going to make when he testified in his own defense, that he knew Chavez only casually. If this evidence had been left for rebuttal, more plausibility would have inured to this rebuttal theory; but in

any event, we all often have street conversations with persons we know casually, or not at all. The jury could not have inferred that the July 5 conversation related to the July 12 sale, as this latter sale was initiated by conversations on July 11. I think the overwhelming thrust of the testimony as to the July 5 sale was to make the jury believe that Gandara had committed a crime on July 5, and having been so wicked as to do this, of course he was more likely to have committed a similar one on July 12. Any other connection of the July 5 incident as testified to with the issues of the case would require an imaginative juryman to perceive.

I add that the Government does not rely on a harmless error theory; rather it seems to believe the evidence as to July 5 was needed because the evidence as to July 12 was circumstantial so far as it implicated Gandara. And it does not seem to be denied that Gandara properly objected to all the evidence relating to July 5, not just that which might be called hearsay, though he did mistakenly characterize as hearsay a part of the July 5 transaction testimony that was not hearsay at all. In other words, the hearsay exclusion is not the only one which, however inartistically, Gandara invokes.