Mateen Abdus SAMAD, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1899.

District of Columbia Court of Appeals.

Argued Dec. 12, 2000.

Decided Dec. 12, 2002.

Peter H. Meyers, appointed by the court, for appellant.

Steven B. Snyder, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Anne Pings, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, RUIZ and GLICKMAN, Associate Judges.

GLICKMAN, Associate J:

Mateen Abdus Samad appeals his convictions after a jury trial of voluntary manslaughter while armed and possession of a firearm during a crime of violence. Samad contends that the trial court plainly erred in failing to investigate reports that a juror had slept through critical parts of the government's case-in-chief. Samad also complains of two evidentiary rulings at trial, one limiting his co-defendant's cross-examination of the main prosecution witness about his activities as a drug dealer, and the other precluding Samad from introducing a redacted portion of his videotaped statement to the police under the rule of completeness. We conclude that Samad's assignments of error do not entitle him to relief, and we affirm his convictions.

## I.

The indictment on which he was tried charged Samad and his co-defendant Darold Watson with first degree murder while armed for the shooting death of William Peterbark, assault with intent to kill while armed for the shooting and wounding of Vernon Ham, and associated weapons offenses. The shootings were a result of neighborhood violence that Ham himself had initiated, and Ham was the government's most important witness at trial.

According to Ham, the precipitating incident was a fight he had with his girlfriend. Ham hit her. She retaliated by hitting him with her car and driving away. Ham could not catch her, so he tracked down her brother and beat him up instead "to give his sister the message." Some of the brother's friends came to his aid as others, including Samad and Watson, looked on. Ham left the battle to retrieve his gun and ran into his friend Peterbark, who drove him back to the scene of the fighting. Ham announced his return by firing his weapon into the crowd. After a shootout in which, remarkably, no one was hit, Ham and Peterbark drove away.

Two days later, Ham and Peterbark were driving again through the neighborhood in which the melee had occurred. They stopped so that Ham could get out of the car to speak with an acquaintance on the street. Peterbark remained in the

vehicle. At this moment, Ham testified, he saw Samad and Watson approaching him on foot with guns in their hands. Samad walked up to the car and fired several shots directly at Peterbark. Watson shot at Ham, who fled. Peterbark was severely injured and died within minutes. Ham was wounded in his arm and managed to escape.

Testifying as the only witness in his defense, Samad described the confrontation differently. Samad said that he happened to be walking to the store with Watson when they came upon Ham unexpectedly. Seeing Ham reach for something in his belt, Samad feared that Ham was about to pull out a gun and begin firing the way he had two days earlier. Samad backed up and began to run away. As he did so, he pulled out a handgun of his own and fired several shots in self-defense in Ham's general direction. Samad denied shooting at Peterbark.[1]

The jury acquitted Samad of assaulting Ham and murdering Peterbark, but convicted him of the lesser included offense of voluntary manslaughter while armed and the associated firearm possession offense.[2]

## II.

Samad argues that the trial court abused its discretion and violated his Fifth and Sixth Amendment rights, as well as Superior Court Criminal Rule 24(c),[3] by failing to investigate or take other action after being informed that juror eleven had been asleep during key parts of the trial.

When the jury was excused for lunch on the second day of trial with Ham still on the witness stand, one of the two Assistant United States Attorneys presenting the case reported to the court that juror eleven appeared to have been sleeping during "pretty essential testimony to the case."[4] The judge said that he would keep a close watch on the juror. Neither government nor defense counsel requested the judge to do anything else.

No more was said about the matter until the end of the day, when the second Assistant United States Attorney reported that juror eleven had been asleep that afternoon during the testimony of both the detective who described Ham's out-of-court identifications of the shooters and the medical examiner who described the autopsy of Peterbark.[5] The judge responded that he had watched juror eleven and "thought he did better this afternoon than he has on other occasions." The judge said that although he "did see [juror eleven] close his eyes," he needed to have

---

1. Watson testified that he too was surprised to see Ham. Watson said that he ran away as soon as the shooting started, did not have a weapon on him, and did not shoot at anyone.

2. The jury found Watson not guilty on all counts.

3. Rule 24(c) provides that a juror who is unable to perform his or her duties shall be replaced by an alternate juror.

4. The Assistant stated:
 I just want ... to alert the Court so we can all watch this and also counsel. We noticed that juror number 11 has been sleeping ... or seemed to be very inattentive during what I think would have to be con-

sidered pretty essential testimony to the case.

5. The Assistant stated:
 Your Honor, I [would] just like to put something on the record. That is that the juror that we were mentioning before, juror number 11, I noticed that he was asleep today during Detective White's direct examination, the cross-examination.
 During cross-examination he was going so far as to nod down and jerk his head back up. He was, had his eyes closed and his head back during the medical examiner's testimony and the cross-examination of the medical examiner.

"more direct evidence" to conclude that the juror had been sleeping. Adding that he was more concerned about juror three, who had a health problem, the judge said that he would continue to watch both jurors. Again, no counsel asked the judge to take any other action.

A few days later, at the conclusion of the trial, the government asked the court to replace juror three because he had been asleep during the closing arguments. Commenting that juror three had been "dozing and closing his eyes through a considerable portion of the trial," the judge granted the government's request. Neither counsel nor court said anything at this time about juror eleven.

 Inasmuch as Samad acquiesced in the trial court's handling of the matter, we review his sleeping juror claim solely for plain error. *See Golsun v. United States,* 592 A.2d 1054, 1056 (D.C.1991). The burden therefore is on Samad to establish that the trial court committed an error that was obvious, that was prejudicial to Samad's substantial rights, and that resulted in a miscarriage of justice or otherwise seriously affected the fairness, integrity or public reputation of judicial proceedings. *See United States v. Olano,* 507 U.S. 725, 734–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

 This court emphasized recently that "[a] fair trial presupposes careful attention by the jurors to all of the testimony, and that both the court and counsel must do all in their power to ensure that jurors do not in fact sleep through any part of the proceedings." *Welch v. United States,* 807 A.2d 596, 604 n. 8 (D.C.2002). To be sure, brief lapses in attention that are not prejudicial may be excused. *See, e.g., United States v. Diaz,* 176 F.3d 52, 78 (2d Cir.1999) (finding no harm where juror "perhaps had slept for a very brief moment, [but] was generally alert and attentive to the evidence"). Prolonged juror inattentiveness in a criminal trial is another matter, however, and jeopardizes the defendant's Fifth and Sixth Amendment rights to a fair trial before " 'a tribunal both impartial and mentally competent to afford a hearing.' " *Tanner v. United States,* 483 U.S. 107, 126, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (quoting *Jordan v. Massachusetts,* 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038 (1912)). "If sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury." *United States v. Freitag,* 230 F.3d 1019, 1023 (7th Cir.2000).

 When a trial court receives a report of a sleeping juror, it has "considerable discretion" in deciding how to respond. *Golsun,* 592 A.2d at 1057. "We accord the trial court substantial deference in exercising its discretion because of the court's familiarity with the proceedings, its observations of the witnesses and lawyers [and jurors], and its superior opportunity to get a feel for the case." *Id.* at 1058. The court's own contemporaneous observations of the juror may negate the need to investigate further by enabling the court to "take judicial notice" that the juror was not asleep or was only momentarily and harmlessly so. *Id.* at 1057 n. 3. *See, e.g., Diaz, supra.* Unsubstantiated or unreliable allegations of juror misconduct therefore need not trigger an evidentiary hearing immediately. However, "[i]f ... the court notices, or is [reliably] informed, that a juror is asleep during trial, the court has a responsibility to inquire and to take further action if necessary to rectify the situation." *Golsun,* 592 A.2d at 1057

The trial court should begin, for example, with a hearing to determine whether the juror had been asleep and, if so,

whether the juror had missed essential portions of the trial. . . . On the basis of its findings the court should then determine whether the juror's conduct had resulted in substantial prejudice to the accused, meaning deprivation of the continued, objective, and disinterested judgment of the juror, thereby foreclosing the accused's right to a fair trial.

*Id.* (internal quotation marks and citations omitted). *See, e.g., United States v. Barrett,* 703 F.2d 1076, 1083 (9th Cir.1982) (holding that "in failing to conduct a hearing or make any investigation into the 'sleeping'-juror question, the trial judge abused his considerable discretion in this area").

■ In the present case, the trial court heard from two Assistant United States Attorneys that juror eleven slept through a substantial part of the second day of trial and missed what one of the Assistants deemed "pretty essential testimony"—apparently that of key prosecution witness Vernon Ham. The reports, credible on their face, were corroborated by the court's own observations (court "did see [juror eleven] close his eyes;" juror "did better this afternoon *than he has on other occasions*" [emphasis added]). In these circumstances the court had the duty that we recognized in *Golsun* to inquire directly whether juror eleven had slept through important testimony. It was not enough merely to place the juror on the "watch list."

Hence we conclude that the trial court did err in allowing juror eleven to remain on the jury without inquiring into the juror's wakefulness. Whether the error was an "obvious" one is debatable, perhaps, given the discretion that a trial court has, and must have, in deciding how to address reports of juror misconduct. Obvious or

not, though, the error in this case did not prejudice Samad, result in a miscarriage of justice, or otherwise seriously undermine the fairness, integrity, or public reputation of the proceedings. There was no plain error.

It is telling that neither defense counsel objected to the continued presence of juror eleven even when the government successfully sought the dismissal of juror three for sleeping. Juror eleven allegedly slept through important parts of *the government's* case, notably the testimony of Vernon Ham. This was prejudicial to the government, not Samad, for the testimony, including what was elicited during cross-examination, supported the prosecution and disfavored the defense. A fair inference is that the defense was not displeased by the juror's slumber. Nor is prejudice, let alone a miscarriage of justice, suggested by the verdict. In convicting Samad of voluntary manslaughter rather than first degree murder (and acquitting Watson of all charges), the jury evidently disbelieved Ham's account entirely and found Samad's self-defense claim credible but flawed. *See Comber v. United States,* 584 A.2d 26, 41–42 (D.C.1990) (en banc) (holding that a mistaken belief that one is in danger is a mitigating circumstance that renders a homicide voluntary manslaughter rather than murder); *Sellars v. United States,* 401 A.2d 974, 977 (D.C.1979) ("[I]f the jury rejected self-defense just because appellant imprudently misjudged the response necessary in the situation, his offense might well have been manslaughter, arising from the unreasonableness of the judgment he made."). It is hard to imagine how Samad would have been better off if juror eleven had attended more fully to the government's witnesses. In similar circumstances, other courts have found no plain error justifying reversal of a convic-

tion.[6] We join them.

### III.

■ Samad challenges two evidentiary rulings. First, he contends that the trial court improperly limited impeachment of the key witness against him in violation of his Sixth Amendment right of confrontation. This contention is unpersuasive. Vernon Ham admitted in his direct examination that he was a drug dealer, had been convicted of distributing cocaine, and had lied to the judge in his case by claiming that he was an addict in order to get a more lenient sentence. During cross-examination, Watson's counsel asked Ham whether he had taught people younger than himself to sell drugs. The government objected and Watson's counsel argued that the question went to Ham's credibility, on the theory that "[a] person who would teach ... someone younger than himself to sell drugs ... is a person that's not to be believed." Sustaining the objection in part, the trial court limited the cross-examination to whether Ham had taught his younger comrade Peterbark to sell drugs—which Ham subsequently admitted he had done. Apart from our previous observation that the jury apparently did not believe Ham's testimony in any event, we are satisfied that the trial court reasonably viewed the proposed impeachment as cumulative at best, and thus did

not abuse its discretion to place reasonable limits on cross-examination. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Scull v. United States,* 564 A.2d 1161, 1164 (D.C.1989). *Cf. Wesley v. United States,* 547 A.2d 1022, 1025 (D.C.1988) (holding that trial court did not abuse its discretion when it permitted prosecutor to cross-examine the defendant about his drug dealing activities where the questioning was within the scope of the direct examination and was related to the defendant's motive to commit the armed robbery with which he was charged).

■ Samad also contends that the trial court abused its discretion when it allowed the government to introduce part of his videotaped statement to the police but did not allow him to introduce another (otherwise inadmissible) part of that statement under the rule of completeness. This issue arose after the government impeached Samad with inconsistent statements he had made in police custody, notably his statement that he saw Ham run away from him as he was shooting. Samad accounted for the inconsistencies by implying that the police had mistreated him. To refute the implication of mistreatment, the court permitted the government to play a few minutes of Samad's lengthy videotaped statement in its rebuttal case. A police sergeant testified that the unthreatening

---

**6.** For example, in *United States v. Krohn,* 560 F.2d 293 (7th Cir.1977), the trial court did not investigate when the prosecutor reported that a juror had been sleeping, but instead sent the original twelve jurors off to deliberate with no opposition from the defense. Only after the jury returned verdicts of guilty did the defense move for a mistrial. In affirming the convictions, the court of appeals stated:

> The only conclusion possible from this record is that defense counsel, fully aware of the existence of the problem that is now pressed upon us, deliberately chose to proceed with the original jury to create a no-

lose situation: either a not guilty verdict would be returned or an arguably tainted guilty verdict would provide a basis for appeal.... We do not think it would be an "affront to the integrity and reputation of judicial proceedings" to refuse to reward appellants' gamesmanship in the circumstances of this case.

*Id.,* 560 F.2d at 297. *See also United States v. Newman,* 982 F.2d 665, 670–71 (1st Cir. 1993); *United States v. Moore,* 580 F.2d 360, 364–65 (9th Cir.1978); *State v. Yant,* 376 N.W.2d 487, 490–91 (Minn.Ct.App.1985).

tone of the interrogation and the moods of the participants "stayed the same from start to finish." Samad's counsel then attempted to play the last few minutes of the videotape, in which Samad cried and expressed remorse, to show that Samad's demeanor changed. Government counsel objected to the admission of Samad's "self-serving" statements. The court sustained the objection. The court reasoned that the prejudice to the government from admitting such statements outweighed their limited probative value "on the narrow issue we're considering here," because the mere fact that Samad became distraught did not show that the interrogation had become coercive or minatory. We think that the court's ruling was a permissible one.

 When part of a statement has been admitted in evidence, the rule of completeness allows a party to seek admission of other parts or the remainder as a matter of fairness. "The rule was designed to prevent parties from distorting the admitted portions by taking them out of context and, to that extent, misrepresenting the whole of a statement by only introducing part of it." *Henderson v. United States,* 632 A.2d 419, 426 n. 17 (D.C.1993). In view of the concern, among others, that "requiring the complete statement to be admitted into evidence will waste time and juror attention by focusing on portions of the statement having no bearing on the point at issue," the rule is not absolute. *Id.* at 425. Instead, implementation of the rule of completeness is committed in the first instance to the discretion of the trial court and is reviewable only for abuse. *See Warren v. United States,* 515 A.2d 208, 211 (D.C.1986). That discretion is not unbounded. We have said, for example, that in a criminal trial the court "upon request *must* admit additional portions [of a defendant's statement] that 'concern the same subject and explain the part already admitted." ' *Henderson,* 632 A.2d at 426 (citation omitted; emphasis in the original). "In addition, where the defense demonstrates that the admitted portions are misleading because of a lack of context, it follows under the rule that the trial judge should permit 'such limited portions to be ... introduced as will remove the distortion that otherwise would accompany the prosecution's evidence." ' *Id.* (citation omitted, ellipses in the original). Conversely, the trial court may exercise its discretion to exclude the remainder of the statement if it is not relevant or has only slight probative value that is "substantially outweighed by dangers of unfair prejudice, confusion of the issues, misleading the jury, or waste of time." *Id.* at 425 (citation omitted).

In this case, the court admitted one portion of the videotape of Samad's statement to the police in rebuttal for a strictly limited purpose—solely to establish that the police did not mistreat Samad when they interviewed him. The court excluded the end of the tape because the fact that Samad broke down on it did not show mistreatment, did not serve to explain or clarify the admitted portion of the tape, and was not otherwise relevant. In our judgment that ruling was reasonable, consistent with the purposes of the rule of completeness, and no abuse of the court's discretion.

## IV.

Finding no reversible error, we affirm appellant's convictions.

*So ordered.*