# IN THE COURT OF APPEALS OF IOWA

No. 17-0761
Filed March 21, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**MAR'YO D. LINDSEY JR.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Bradley J. Harris, Judge.

The defendant challenges his convictions of intimidation with a dangerous weapon, willful injury causing bodily harm, possession of a firearm by a felon, going armed with intent, and carrying weapons. **AFFIRMED.**

Sandra P. Trevino of Jensen & Trevino, P.C., East Dubuque, Illinois, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., Mullins, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**BLANE, Senior Judge.**

Mar'yo Lindsey Jr. appeals from his convictions of intimidation with a dangerous weapon, willful injury causing bodily harm, possession of a firearm by a felon, going armed with intent, and carrying weapons. Lindsey maintains there is insufficient evidence to support his convictions, arguing that the State failed to prove he was the person who possessed or used a firearm—necessary elements in each of the five crimes. Lindsey also maintains his trial counsel provided ineffective assistance by failing to create a contemporaneous record of a sleeping juror that would have supported his motion for new trial based on juror misconduct.

**I. Background Facts and Proceedings.**

On December 15, 2016, at 7:49 p.m., Waterloo dispatch received a 911 call indicating gunshots were fired at a location in west Waterloo. When local police responded to the call, they found a residence that had been shot twelve to fourteen[1] times. Officers made contact with the resident of the home, Christine Williams, and her two children. Williams's nine-year-old son had been struck by a bullet that went "through-and-through" his left buttock; he was taken to a local hospital by ambulance and was released one day later.

In speaking with Williams and her cousin Shanelle Madlock, who arrived a few minutes later, officers learned that Madlock had been spending time at Williams's home daily and often used Williams's car to run errands. Madlock reported she had been receiving death threats from the family and friends of a

---

[1] According to testimony from a division of criminal investigations (DCI) worker, officers identified fourteen locations on the home they believed were struck by a bullet but located only twelve shell casings.

recent shooting victim who blamed Madlock for the victim's ultimate death. At some point in the discussion, Madlock or Williams mentioned Aundrey Roberts Jr. to officers. The officers were aware that Roberts was being monitored by the department of corrections through an ankle device with GPS, and they contacted the department for records regarding his whereabouts that night.

At the same time, other officers canvassed the neighborhood. One of Williams's neighbors told officers she heard multiple gunshots from inside her home and then went outside to see what was happening. After she got outside, she noticed two people running away, one in a black hoodie and one in a gray hoodie.[2] She showed officers where she saw the people running. From that, officers followed the sets of tracks in the snow on the ground until they lost them, in the area of Freedom Lane.

Using the security system from a nearby apartment, officers were able to review recordings of the nearby area—though not the actual location of the shooting. In doing so, they noticed a gold Trailblazer appeared to be circling the area around the same time the shooting took place. The vehicle was registered to Lindsey. The recording also showed two people exiting the Trailblazer. Both had their faces covered. The one who exited the front, passenger side of the vehicle wore a striped sweatshirt, with alternating dark and light stripes. A second person exited the rear, driver side of the vehicle before the vehicle was driven away by an unseen third person. The two persons who exited the vehicle then proceeded to walk with their left hands swinging freely and their right hands stationary against

---

[2] At trial, the neighbor admitted that she had been prescribed glasses, which she was not wearing when she went outside and saw the persons running.

their bodies. An officer opined that the right hand of each person was being used to hold something against the person's body—possibly a firearm.

After receiving the records of Roberts's location according to his GPS monitor and comparing them with the location of the gold Trailblazer, officers determined Roberts was in the Trailblazer.

From 7:45 to 7:49 p.m., Roberts's GPS shows he was stationary at the corner of Freedom Lane and Wellington, an area a couple blocks away from the residence that was shot and the same area the sets of footprints the police followed appeared to end.

At 8:30 p.m., Roberts's monitor indicated he stopped for a number of minutes at a local gas station. Images obtained from the gas station show Lindsey exiting the front, passenger side of the Trailblazer. Roberts also exited the Trailblazer—from the driver's seat—and then proceeded to enter the gas station. According to the GPS records, Roberts, who had a 9:00 p.m. curfew, was home by approximately 8:37 p.m.

At 9:50 p.m., officers located Lindsey's gold Trailblazer in the ditch near his father's home. After obtaining a warrant, the officers took the vehicle and Lindsey to the police station as part of their investigation. During their search of the vehicle, officers located a dark blue and gray striped sweatshirt, which was sitting in the front, passenger seat. Officers also seized Lindsey's shoes that he was wearing at the time, size 9.5 Nike Air Max that were dark in color.

On December 23, Lindsey was charged by trial information with intimidation with a dangerous weapon, willful injury causing bodily harm, possession of a firearm by a felon, going armed with intent, and carrying weapons.

The matter proceeded to trial in March 2017. At trial, Lindsey indicated there was "[c]ertainly no dispute [that] there was a shooting that took place, [and] that there was an unfortunate victim in this case as well," but disputed that the evidence proved beyond a reasonable doubt that he took part in the shooting.

A criminalist from the DCI testified that images taken of the shoeprints in the snow that the officers tracked to Freedom Lane, near where Roberts was stationary from 7:45 to 7:49 p.m., were "consistent in size, physical size and outsole design with the left Air Max shoe" seized from Lindsey. The criminalist continued:

> They are consistent, which means that a shoe of that size, of that manufacturer and that outsole design could make that impression, but it doesn't mean that it is an identification because there were no individual characteristics, no cuts, scrapes, abrasions that we could use for comparison that correspond between the shoes that were submitted and the impressions at the scene. . . . [A]nother Nike of that size and outsole design is also capable of making it.

Another DCI technician testified that, of the twelve casings that were located at the scene, four of them were shot from a single nine millimeter handgun, while the other eight casings were fired from a single .40 caliber handgun.

Admitted into evidence was a video recording of Lindsey being interviewed at the police station on the night of December 15; the recording was played for the jury. In it, the investigating officer told Lindsey that the police were looking into a crime and were interested in his "timeline" so they could determine whether or not he was a part of it. Lindsey listed a number of places he visited that day, including his girlfriend's house, his father's house, his grandfather's house, and his friend's house—all locations apparently on the east side of Waterloo. Lindsey did not mention that he was with Roberts or that he went to the gas station on the west

side. The officer asked Lindsey if he stopped anywhere else that night, and Lindsey stated he did not. The officer then told Lindsey he did not "believe that was the complete truth," explaining that Lindsey's "vehicle was on a camera in a different part of town." Lindsey did not respond that he had loaned his car to anyone; he responded, "I don't know what to tell you, sir."

Before the case went to the jury for deliberation, Lindsey moved for a judgment of acquittal,[3] arguing:

> We feel that the evidence that's been presented by the State even viewing in the light most favorable to the State does not present a question for the jury. We feel the evidence comes up short as far as placing Mr. Lindsey at the scene of this incident, and therefore the court should acquit him on all charges.

The State resisted, and the court denied Lindsey's motion, stating:

> [I]t appears that the—that the issue in this case is not whether this crime was committed but rather if the defendant was involved. The evidence to show that he would be available at the scene is that his vehicle is seen a short distance from [the scene] and the—and the— a time very near to the time that the shooting took place. There is clothing matching the clothing of one of the shooters found in the defendant's vehicle after the shooting. There is a shoe print similar to—with tread marks similar to the shoe worn by the defendant found in a—in a path that—that the—that the shooters were seen to have gone. And within an hour of the shooting the defendant is back in the—is in his vehicle seen on video.

After deliberating, the jury convicted Lindsey as charged. Lindsey appeals.

## II. Discussion.

---

[3] Counsel for Lindsey actually stated he was making a motion "for a directed verdict for acquittal." For purposes of this appeal, we treat Lindsey's motion as one for judgment of acquittal. *See State v. Adney*, 639 N.W.2d 246, 249 (Iowa Ct. App. 2001) (treating motion for directed verdict as a motion for judgment of acquittal because the grant of such a motion is tantamount to a judgment of acquittal in a criminal action (citing *State v. Deets*, 195 N.W.2d 118, 123 (Iowa 1972))).

**A. Sufficiency of the Evidence.**[4]

Generally, to preserve an argument regarding the sufficiency of the evidence, a defendant must make a motion for judgment of acquittal that is both timely and involves the specific argument raised on appeal. *See State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). "However, we recognize an exception to the general error-preservation rule when the record indicates that the grounds for a motion were obvious and understood by the trial court and counsel." *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005). Here, the State concedes, and we agree, that it was clear to both counsel and the court that Lindsey was challenging the evidence to support he was involved in each of the five crimes. Thus, we proceed to the merits of Lindsey's claim.

"We review sufficiency-of-the-evidence claims for correction of errors at law." *Id.* "We consider all record evidence not just the evidence supporting guilt when we make sufficiency-of-the-evidence determinations." *Id.* However, we view the record evidence "in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonable be deduced from the record evidence." *Id.* (citation omitted).

Lindsey maintains there is not substantial evidence to support the jury's conclusion on each of the five charges that he was the person present at the scene

---

[4] In his appellate brief, Lindsey conflates arguments regarding the sufficiency of the evidence and the weight of the evidence. As the State points out, "These claims are distinct, with dissimilar standards of review." Because the case law he cites in support of his argument pertains to the sufficiency of the evidence, we consider Lindsey's claim as one challenging whether substantial evidence supports his convictions. As he mentions the weight of the evidence only in passing and has not cited any authority to support a weight-of-the-evidence challenge, insofar as Lindsey intended to raise such claim, we consider it waived. *See* Iowa R. App. P. 6.903(2)(g)(3).

of the house shooting, possessing or pulling the trigger of a gun. We acknowledge that there was no eyewitness testimony of the shooting and no DNA evidence linked Lindsey to the scene or the crime. "However, circumstantial evidence is just as probative as direct." *State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981).

While no eyewitness was able to name Lindsey as one of the shooters and no DNA evidence placed him at the scene, substantial evidence supports each of the jury's five verdicts. Video footage from the surveillance system of a building near the location of the shooting captured the image of two people exiting Lindsey's Trailblazer a few minutes before the shooting occurred. In the video, it is apparent the two people have covered their faces—presumably for nefarious purposes. The person who exits the front, passenger side of the vehicle was wearing a sweatshirt with alternating dark and light stripes. Officers opined that the way the two people walked with their right hand against their body indicated they were each holding something steady; later DCI reports confirmed that two different guns were used to shoot the home.

No one witnessed the actual shooting take place, but one of Williams's neighbors saw two people running away from the scene afterward. She showed officers where the two people ran, and officers were able to follow two sets of shoe prints to Freedom Lane—the same area where Roberts's GPS indicated he was stationary until 7:49 (which was approximately the same time the first 911 call about the shooting was received).

Less than fifty minutes later, surveillance cameras from a gas station captured Lindsey exiting the passenger side of his vehicle, with Roberts then exiting the driver's side of the vehicle. Moreover, when officers seized Lindsey

and his vehicle approximately two hours after the shooting, they found a sweatshirt in the front, passenger side of the Trailblazer (where Lindsey had been sitting) that appeared to match the one worn by the person exiting the passenger side of the Trailblazer on the surveillance video. The left shoe seized from Lindsey was found to be consistent with the shoeprints the officers followed to Freedom Lane.

Finally, when asked to explain his timeline of the night, Lindsey provided officers with a list of locations on the east side of Waterloo. Lindsey implies it is possible he just failed to provide the officer with an exhaustive list. Yet, he was explicitly asked if he had been anywhere else and denied it, even though his vehicle had been captured on security cameras on the west side of town.

Viewing the evidence in the light most favorable to the State, when the dots of circumstantial evidence are connected, substantial evidence supports each of the jury's five verdicts.

**B. Ineffective Assistance of Counsel.**

Lindsey maintains his trial counsel provided ineffective assistance by failing to create a contemporaneous record of a sleeping juror that would have supported his motion for new trial based on juror misconduct. To prevail on a claim of ineffective assistance of counsel, Lindsey must prove by a preponderance of the evidence (1) his attorney failed to perform an essential duty and (2) prejudice resulted from the failure. *See State v. Rodriguez*, 804 N.W.2d 844, 848 (Iowa 2011). We review claims of ineffective assistance of counsel de novo. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). This is our standard because such claims have their basis in the Sixth Amendment to the United States Constitution. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

Here, in a motion for a new trial, trial counsel claimed Lindsey was entitled to a new trial for jury misconduct, pursuant to Iowa Rule of Criminal Procedure 2.24(2)(b)(3). At the hearing on the motion, counsel informed the court:

> [E]ssentially it was a juror that was sleeping during trial. This is something that I myself did not notice. I have kind of a bad angle where I'm sitting perpendicular to the jury and simply did not notice it. However, it was pointed out to me very early in the trial by Mr. Lindsey's father who did notice that a particular juror was asleep. And then after we went and spoke to the Jury, with [the prosecutor] in the room and unprompted by anyone, the same juror indicated— admitted that he had been sleeping during the trial and had to be woken up by fellow jurors. So we feel that given that fact that this juror obviously was not paying attention during the trial and as a result Mr. Lindsey did not receive a fair trial and, again, for that reason we feel that a new trial would be warranted as well.

The State resisted the motion, arguing, "[T]here must be some evidence establishing the misconduct affirmatively. There is no testimony on the record or anything that would do so. And also that it must show that that had some prejudice or influence on the verdict in this case."

The court denied Lindsey's motion. In doing so, the court stated:

> Regarding the claim that the juror was sleeping, this court did not note that the juror was sleeping. I will state that on one day, I believe it was the second day of trial, the juror—one juror appeared to be nodding or nodding off. The court immediately took a recess in the middle of the examination of a witness to allow that—to be certain that wasn't a problem. That's the only time that the court noticed that. There has been no other evidence to show that a juror was sleeping in the record at this time, so the court would overrule the motion for new trial.

Lindsey maintains that trial counsel had a duty to make a contemporaneous record of the sleeping juror and that if he would have done so, the court would have then granted his motion for new trial. In response, the State urges us to preserve Lindsey's claim for further development of the record in possible later

proceedings. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) ("If the defendant requests that the court decide the claim on direct appeal, it is for the court to determine whether the record is adequate and, if so, to resolve the claim.").

We agree with the State that the record before us is inadequate to decide Lindsey's claim. *See State v. Tate,* 710 N.W.2d 237, 240 (Iowa 2006) (noting we prefer to preserve ineffective-assistance claims for the development of the record). Trial counsel's statement at the hearing made it clear he was apprised of a sleeping juror "very early in the trial." But it is unclear if trial counsel's delay in raising the issue was a strategic decision. "Because '[i]mprovident trial strategy, miscalculated tactics, and mistakes in judgment do not necessarily amount to ineffective assistance of counsel,' postconviction proceedings are often necessary to discern the difference between improvident trial strategy and ineffective assistance." *State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006) (alteration in original) (citations omitted). Such a strategy is certainly not unheard of. *See, e.g.*, *United States v. Krohn*, 560 F.2d 293, 297 (7th Cir. 1977) ("The only conclusion possible from this record is that defense counsel, fully aware of the existence of the problem that is now pressed upon us, deliberately chose to proceed with the original jury to create a no-lose situation: either a not guilty verdict would be returned or an arguably tainted guilty verdict would provide a basis for appeal."). It is also unclear whether the claimed sleeping juror was the same juror whom the court observed "nodding off" and where the court took a recess to address the issue.

Thus, we preserve Lindsey's claims for possible postconviction-relief proceedings. *See Johnson,* 784 N.W.2d at 198 ("If . . . the court determines the

claim cannot be addressed on appeal, the court must preserve it for a postconviction-relief proceeding, regardless of the court's view of the potential viability of the claim.").

**III. Conclusion.**

Because substantial evidence supports each of Lindsey's convictions, we affirm. We preserve his claim of ineffective assistance for further development of the record in possible later proceedings.

**AFFIRMED.**